The Court's approach, as expressed in the controlling opinion, is well stated in the following extracts therefrom, viz:
"As alleged in the bill, the property involved was occupied as a residence for more than a decade after the restrictions were imposed, until 1942, and meanwhile the population of the City of Miami Beach had increased six-fold. During this time, as we have said in analyzing the bill, the area adaptable to the location of hotels and apartment houses had built up almost solidly with structures of that nature. The steady march of these buildings was halted abruptly at the south line of the lot in question. * * *
"It is argued that the changes wrought by these developments have so affected the character of the property that it, too, should now be adaptable to the construction of hotels and apartments. * * *
"Doubtless the property would not now have the same appeal as a home site, but for fourteen years, and until the bill of complaint in this case was filed, what transpired in the way of construction was only what was contemplated when the ordinance was passed and that territory declared usable as a location for hotels. The question is: Should the ordinance now be held invalid because what was expected by the city, and known by the appellee and his predecessor for that long period to be expected by it, came to pass? * * *
"Summarizing, we believe * * * that the peculiar characteristics and qualities of the City of Miami Beach justify zoning to perpetuate its aesthetic appeal, and that this is an exercise of the police power in the protection of public welfare."
The ultimate findings of fact by the Master which tend to conclusively determine the controversy were as follows:
 "28.
"Said Lot A is reasonably suitable and desirable for said `RAA' Estate District use, as said use is defined by said Zoning Ordinance 289 as now amended.
 "29.
"Those parts of said Zoning Ordinance No. 289 as now amended that zone or restrict said Lot A for said `RAA' Estate District use, and that placed said Lot A in said `District No. 3,' are reasonable, and are within the limits of necessity for the public or general welfare of the City of Miami Beach."
Some of the controlling evidentiary findings of fact upon which the aforesaid ultimate findings of the Master were based were as follows:
 "11.
"Between December 3, 1930, the date of the adoption of said Zoning Ordinance No. 289, and the time of the hearings before the special master, a great many apartment houses and hotels were erected in that area lying between the south line of said Lot A and 30th Street, and between the Atlantic Ocean and Indian Creek Drive, as was permitted by said zoning ordinance. On August 22, 1945, the hotels and apartment houses erected on the lots of land immediately south of the south line of said Lot A are partly shown by plaintiff's exhibits 12, 13 and 15.
"At the time of the hearings before the special master, the Surrey Hotel and the Broadripple Hotel were located on a lot of land at the southwest intersection of Collins Avenue and 44th Street, which lot of land was bounded on the north by the south line of 44th Street. The Surrey Hotel faces east on Collins Avenue, and is separated from the western portion of said Lot A by 44th Street, which is 60 feet wide. The Broadripple Hotel faces west on Indian Creek Drive, and is separated from the west portion of said Lot A by 44th Street. Pictures of said Surrey Hotel were admitted in evidence as plaintiff's exhibits 15 and 16. Plaintiff's exhibit 17 is a photograph of a portion of the north side of the Broadripple Hotel. At the time of the hearings before the special master, the Sovereign Hotel was located on lots of land situate about 125 feet south of the eastern portion of said Lot A. Canvas *Page 686 
cabanas have been erected on the land lying between the north side of the Sovereign Hotel and the south line of the eastern portion of said Lot A. A picture of the north side of the Sovereign Hotel was admitted in evidence as plaintiff's exhibit 18. The Surrey Hotel and the Sovereign Hotel are also shown by a photograph which was admitted in evidence as plaintiff's exhibit 26.
"The erection of said hotels, apartment houses and municipal family dwellings in the aforesaid area, to-wit: `That area which is bounded on the north by the south line of said Lot A and the south line of 44th Street, bounded on the east by the Atlantic Ocean, bounded on the south by 30th Street, bounded on the west by Indian Creek Drive,' during that period of time between December 3, 1930, and the time of the hearings before the special master, caused said Lot A to be less valuable and desirable for said `RAA' Estate district use than those lots in that area between the north line of said Lot A and the south line of 55th Street (if said 55th Street was extended easterly to the Atlantic Ocean), and between the Atlantic Ocean and Collins Avenue, because said hotels, apartment houses and multiple family dwellings very materially increased the traffic on 44th street and on that part of Collins Avenue which bounds said Lot A was thereby changed from vacant lots and a few buildings to one of many hotels and apartment houses, and because some of the privacy of any dwelling houses on said Lot A was destroyed by the proximity of the Surrey Hotel, the Broadripple Hotel and the Sovereign Hotel. But said erection of those hotels, apartment houses and multiple family dwellings was permitted by said Zoning Ordinance No. 289.
 "14.
"According to the federal census for the year 1930, the permanent population of the City of Miami Beach in the year 1930 was 6,419. According to estimates, which the city manager of the City of Miami Beach thinks are reliable, the permanent population of the City of Miami Beach in the year 1944, was approximately 35,000.
 "21.
"The 1945 City of Miami Beach taxes against said Lot A was the sum of $3,693.60; the 1945 county taxes against said Lot A was the sum of $3,685.50; the 1946 City of Miami Beach taxes against said Lot A was the sum of $3,270.80; and the 1946 county taxes against said Lot A was the sum of $5,048.08.
 "23.
"On October 25, 1944, the reasonable market value of said Lot A, as zoned for said `RAA' Estate District use and as placed by said zoning ordinance in said District No. 3, was the sum of $400,000.00.
 "25.
"On August 31, 1945, the reasonable market value of said Lot A together with all improvements thereon, if it was then zoned for said `RE' Multiple-Family District use (which use would permit the erection of apartment houses and hotels) was the sum of $1,750,000.00.
 "26.
"On October 19, 1945, a fair annual rental value of said Lot A, as zoned for said `RAA' Estates District use, was the sum of $10,000.00."
As to the foregoing findings of the Master's Report exceptions were sustained only to the underscored words and the Chancellor made no findings inconsistent with the quoted findings of the Master except as to those numbered 28 and 29 first above quoted.
Upon final hearing the Chancellor accepted the quoted evidentiary findings of fact and in his final decree, among other things, stated and found:
"There is no material conflict or controversy, if any, as to the facts shown by the evidence. The inspection and view made by the Court fully confirms the proof of the existing physical conditions shown by the evidence (No assignment of error on this).
 * * * * *
"(h) The City rezoned both sides of 41st Street west of Indian Creek into a business district followed by erection of stores, restaurants, shops, a theatre, and other *Page 687 
business, and by the building of a bridge over Indian Creek connecting 41st Street with Collins Avenue and Indian Creek three blocks south of Lot A, and increased traffic in the vicinity of Lot A.
"11. The development of the hotel district, the erection and operation of the Broadripple Hotel, the Surrey Hotel and the ocean front Sovereign Hotel, with its bathing beach, the changes in Collins Avenue and 44th Street and increased traffic, the use of the adjoining lot as a cabana colony and bathing beach and other changes and developments, have destroyed the privacy, outlook and view, quiet and comfort of Lot A, and its suitability and usefulness, and materially impaired its value, for single family, private residence purposes.
"That, as conclusively shown by the testimony of the owners of `RAA' single family estate ocean front property north of Lot A, the approach and proximity of the hotel development and the other conditions aforesaid, have made Lot A undesirable, unsuitable and unusable for residence purposes by the type of people who are financially able to own and maintain ocean front homes."
Only these ultimate findings of fact by the Chancellor were inconsistent with the ultimate findings of the Master numbered 28 and 29 (supra), the exceptions to which latter findings had been sustained by the Chancellor.
Both the Master and the Chancellor found that the value of the property as zoned for residential purposes was $400,000, which is less than the original cost of the improvements placed on the property in 1916, at pre-World War I prices.
Should the zoning ordinance permit the property to be cut up into 100 foot strips, which would average at the valuation fixed for residential purposes slightly less than $60,000 each, said lots for apartment and hotel purposes would have an average value of $250,000.
The area south of the Firestone Estate is not encumbered with the zoning restrictions as is the Firestone Estate and it has grown and has doubtless been developed to the highest, best, and most suitable use, but such development is denied the Firestone Estate. It is restricted to that use to which it was dedicated 33 years ago.
The zoning restriction is too harsh, and to enforce the ordinance as against plaintiff-appellee's six and one-half acres is to take appellee's property without due process. The ordinance should be modified and made to fit the changed conditions. The price of progress has destroyed the original character and its natural use now is different from then.
It seems most far-fetched to hold that ocean front property on Miami Beach next to the hotels at 44th Street must be used for Estate purposes — a most unnatural and unreasonable imposition on private property, in the name of an exercise of "police power."
The Chancellor should be affirmed.
CHAPMAN, J., concurs.